IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHERYL CONLEY, | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:17-CV-2877 |
| | § | |
| HOUSTON AQUARIUM, INC., and | § | |
| LANDRY'S INC., | § | |
| | § | |
| Defendants | § | |

## Original Complaint for Declaratory and Injunctive Relief

Ms. Cheryl Conley files this complaint for declaratory and injunctive relief against the Houston Aquarium, Inc. and Landry's, Inc. to prevent further violations of the Endangered Species Act. In support, she alleges:

## I.    Introduction and Summary of the Case

1.    Four tigers live at the Downtown Aquarium, an amusement park and restaurant complex in downtown Houston, and have not been outside for more than thirteen years. The tigers divide their time between a public concrete viewing area and a small metal cage outside of the public's view. Their only sources of sunlight are small windows and skylights; the floor they walk on is hard and unyielding. These conditions are far out of line with generally accepted practices in the zoo world; are not contemplated, let alone sanctioned, by the Animal Welfare Act; and have actually injured the tigers and significantly disrupted their normal behavioral patterns. This case challenges these conditions under the Endangered Species Act and seeks to enjoin the Downtown Aquarium from continued violations of the Act.

1

2.     Since the 1970s, zoos worldwide have made dramatic changes to big cat exhibits, reflecting increasing concern about the well-being and needs of the species they house. As a direct result of these changes, zoos have moved large cats like tigers from tight, prison-like cages, lacking variety or opportunities for stimulation, to naturalistic outdoor habitats, which encourage the captive cats to express a broader range of behaviors more comparable to those typical of their relatives in the wild.

3.     Among the 231 zoos accredited by the Association of Zoos and Aquariums ("AZA"), only the Downtown Aquarium's owners—defendants Landry's, Inc. and the Houston Aquarium, Inc. (together, the "Downtown Aquarium")— missed the memo. Since 2004, the Downtown Aquarium in Houston has housed four tigers—Nero, Marina, Coral, and Reef (the "Aquarium Tigers")—in an entirely indoor, concrete and metal habitat that resembles zoo exhibits of yesteryear. The tigers spend all of their time either in a tight metal cage or walking on hard concrete and do not have access to direct sunlight. Most troubling, the tigers have not been outside for more than 13 years. Only one other AZA-accredited facility subjects its tigers to similar conditions: the defendants' other tiger exhibit at the Aquarium in Denver, Colorado. Meanwhile, the defendants claim billions of dollars in assets. The Downtown Aquarium can and must do better by its tigers.

4.     For nearly fifty years, the Endangered Species Act ("ESA") has protected all tigers, including the Aquarium Tigers, from unauthorized "takes." The ESA defines "take" broadly to include ***harm***, "an act which actually kills or injures

wildlife," and *harassment*, "an intentional or negligent act or omission," which deviates from "generally accepted… [a]nimal husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act," and which "creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns…" 50 C.F.R. § 17.3. According to generally accepted practices and the AZA's even more basic requirements, captive tigers must have access to the outdoors, direct sunlight, and natural surfaces. Without these basic conditions, tigers are likelier to suffer from behavioral problems such as stereotypic repetitive pacing and to endure physical injuries over the long-term.

5.     The Downtown Aquarium's tiger habitat falls far short of widely accepted practices and violates the ESA. By the defendants' own admission, the Downtown Aquarium does not give the tigers any access to the outdoors. The tigers also do not have access to direct sunlight or natural surfaces and lack sufficient space. These conditions, which significantly disrupt the tigers' normal behavioral patterns and otherwise have injured them, "harass" and "harm" the tigers within the meaning of the ESA and must be stopped.

6.     This case seeks declaratory and injunctive relief under the ESA. 16 U.S.C. §§ 1531, 1541. Cheryl Conley, the plaintiff in this case, asks the Court to enjoin the Downtown Aquarium from continuing to hold the Aquarium Tigers in conditions that are species-inappropriate, including (a) keeping the tigers entirely

indoors, (b) keeping the tigers in small holding cages for extended periods of time, and (c) forcing the tigers to spend most of their time on hard, unnatural surfaces.

## II.  Jurisdiction and Venue

7.     This Court has jurisdiction and authority to grant the relief requested. *See* 16 U.S.C. §§ 1540(c) & (g) (ESA), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 2201 *et seq*. Declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, is available because this civil case presents an actual controversy for which this Court can declare rights and legal relations of the interested parties.

8.     The plaintiff Cheryl Conley ("Ms. Conley") has met statutory prerequisites to bringing this action. *See* 16 U.S.C. § 1540(g)(2)(A)(i). On September 19, 2016, Ms. Conley notified the Downtown Aquarium of her intent to sue them for violations of the ESA ("Notice Letter"). *See* X-2. On September 21, 2016, the Downtown Aquarium and/or its authorized agents received the Notice Letter. X-3 (Returns of Service).

9.     On September 19, 2016, Ms. Conley also sent the Notice Letter to Sally Jewell, then-Secretary of the Interior, and Daniel M. Ashe, Director of the United States Fish and Wildlife Service ("FWS"). X-2. Both letters were received on September 26, 2016. *See* X-3 (Returns of Service). Because the Downtown Aquarium is located on land owned by the City of Houston and leased from the City, Ms. Conley also sent Mayor Sylvester Turner a copy of the notice. *See* X-2.

10.     Before sixty days passed, the defendants sued both Ms. Conley and her counsel in this case for defamation and other related claims. On February 22, 2017,

the 334th Judicial District Court for Harris County dismissed the defendants' case under the Texas Citizen's Participation Act, which "encourage[s] and safeguard[s] the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law," Tex. Civ. Prac. Rem. Code § 27.002, and ordered the defendants here to pay attorney's fees and an additional sanction. The judgment is on appeal.

11.    As of the date of this filing, more than sixty days have passed since Ms. Conley provided notice of her intent to sue. *See* X-2 & X-3. The violations identified in the Notice Letter continue to occur and are reasonably likely to continue to occur. Despite seeming to concede an outdoor enclosure may be needed, the Downtown Aquarium has not taken any action to remedy or prevent continued violations of the ESA. The Secretary of the Interior has not initiated an action to impose a penalty under 16 U.S.C. § 1540(a), and the United States has not taken any action to prevent continued violations of the ESA.

12.    Venue lies in the Houston Division of the Southern District of Texas under the ESA, 16 U.S.C. § 1540(g)(3)(A), because alleged violations of the ESA have occurred and will continue to occur in this district. Venue also is proper in this district under 28 U.S.C. § 1391(b).

## III.    Parties

13.    Plaintiff Cheryl Conley is a long-time resident of Montgomery, Texas and grandmother of three who owns Backyard Radio, a small not-for-profit radio station in Magnolia, Texas. Ms. Conley has served on the boards of local wildlife organizations for more than ten years and cares for injured animals at her house as

a licensed rehabilitator for the State of Texas. Ms. Conley is passionate about animal welfare and particularly drawn to tigers.

14.    Defendant Houston Aquarium, Inc. owns the Downtown Aquarium and is a wholly-owned subsidiary of defendant Landry's, Inc. Together, they have deprived the tigers of access to the outdoors and subjected them to other species-inappropriate conditions since 2004, as described in this complaint.

15.    Both defendants reside at 1510 West Loop South, Houston, Texas 77027-9505 and can be served through their registered agent Steven L. Scheinthal at that same address.

16.    Both defendant corporations are one hundred percent-owned by Mr. Tilman J. Fertitta—a resident of the Southern District of Texas—and a successful businessman and television personality who stars in the CNBC show, "Billion Dollar Buyer."

17.    In 2015, Ms. Conley decided to combine her interest in animals with her work at Backyard Radio by starting a radio program which would profile Houston-area wildlife. Ms. Conley and her husband identified the Downtown Aquarium as a candidate for an initial episode. As part of her background research, Ms. Conley scheduled a behind-the-scenes tour through the Downtown Aquarium's public relations firm.

18.    The tour took place in March 2015 and comprised a guided 15-minute behind-the-scenes tour of the tigers' holding area, followed by a self-guided visit to the tigers' public viewing area. During her tour, Ms. Conley was shocked to learn

the Aquarium Tigers do not have access to the outdoors or anything resembling a natural life and instead spend significant time in small metal holding cages.

19.    Ms. Conley felt a strong connection to the tigers and compassion for them given their situation. But Ms. Conley faced a difficult choice: She either would have to continue to see the tigers in these inappropriate conditions or never visit them again. One thing was clear: Ms. Conley could not in good conscience move forward with her radio program. Instead, Ms. Conley chose to use the time she would have spent on the radio program to advocate for improvements to the Aquarium Tigers' living conditions.

20.    Viewing the Aquarium Tigers' current living conditions has caused and will continue to cause Ms. Conley aesthetic, emotional, and recreational injuries. The Downtown Aquarium caused and will continue to cause these injuries unless the tigers' living conditions are improved. If the Downtown Aquarium would update its exhibit to give the four tigers species-appropriate living conditions, including meaningful access to the outdoors, Conley would be able to enjoy visiting them again. Alternatively, if the Aquarium Tigers were relocated to an accredited animal sanctuary, Conley would be able to visit both the Aquarium Tigers and the Downtown Aquarium without distress and without suffering more aesthetic and emotional injury—both of which she fully intends to do if this lawsuit is successful.

21.    Thus, if Ms. Conley prevails in this action, her injuries would be redressed. The Downtown Aquarium would have to correct its violations of the ESA or relocate the tigers to a reputable sanctuary, either of which would put an end to

living conditions that "take" the tigers in violation of the ESA. If this were to occur, Ms. Conley would visit the four tigers as often as possible, whether at an expanded habitat at the Downtown Aquarium, upgraded to address the concerns outlined in this lawsuit, or at a reputable sanctuary, including those located out-of-state.

### IV.   Factual Allegations

22.   The Downtown Aquarium opened in 2004 on city-owned land located under and next to Interstate 45 in downtown Houston, Texas. In or around 2004, the Downtown Aquarium obtained variances from local laws prohibiting the ownership of exotic animals or displaying animals in restaurants, and transported four unrelated captive-bred white tigers named Nero, Marina, Coral, and Reef to the Downtown Aquarium.

23.   Since their arrival at the Downtown Aquarium approximately thirteen years ago, the tigers have spent all their time in one of two indoor enclosures: a concrete exhibit (the public "Tiger Exhibit"); or one of several small metal holding cages out of public view (the "Tiger Holding Area"). Photographs of these enclosures are included with the Notice Letter attached as X-2.

24.   The Tiger Exhibit is composed entirely of concrete or similar hard, artificial material. Small windows and a skylight provide the only source of indirect natural light. The Tiger Exhibit features a small pool at its center and a fake tree but contains no permanent naturalistic elements, such as dirt substrates. The Tiger Exhibit does not give the tigers any access to the outdoors or opportunities to hide from the public's view. Only one or two tigers are in the Exhibit at any given time.

25.   On information and belief, the Tiger Holding Area contains four cages that are approximately 10' x 10' in size. The cages are composed of metal and other hard materials and have a small bench inside. The flooring is composed entirely of concrete or similar hard, artificial material. Skylights, possibly tinted over or otherwise obscured, provide the only source of natural light while the tigers are in the Tiger Holding Area.

26.   Although some photographs suggest the cages may, at times, contain a hammock or other toys, when Ms. Conley visited, the cage was bare.

27.   According to Downtown Aquarium curator Maggie Morse, the tigers spend a minimum of ten hours per day in the Tiger Holding Area, and perhaps as many as twenty hours.[1]

28.   As described below, these conditions fall far short of species-appropriate conditions and have injured the four tigers.

### Species-Appropriate Conditions for Tigers in Captivity

29.   It is generally accepted that captive tigers must have access to the outdoors, space to roam, sunlight, and natural surfaces. By depriving captive tigers of these conditions, an exhibitor creates the likelihood of injury to the captive tigers by annoying them to such an extent as to significantly disrupt normal behavioral patterns.  These conditions also may actually injure captive tigers.

30.   The Association of Zoos and Aquariums publishes a Tiger Care Manual, which outlines the most basic requirements for tiger care in facilities like

---

[1] Video at 1:36, White tiger controversy: Houston Downtown Aquarium, animal group clash over exhibit, KPRC Channel 2, available at http://www.click2houston.com/news/investigates/downtown-aquarium-animal-group-clash-over-white-tiger-exhibit (last viewed on Sep. 19, 2017).

the Downtown Aquarium "based on the most current science, practices, and technologies used in animal care and management." X-1, AZA Tiger Species Survival Plan (2016), Tiger Care Manual ("Tiger Care Manual") at 5 (General Information). In its most recent Tiger Care Manual, issued in 2016, the AZA instructs that: "Careful consideration should be given to exhibit design so that all areas meet the physical, social, behavioral, and psychological needs of the species." *Id.* at 11 (¶ 2.1). According to the AZA, tigers, due to "their large size and activity patterns, large felids [like tigers] should be maintained in outdoor enclosures with access to natural light." *Id.* at 9 (¶ 1.2).

31.     The AZA's specifications reflect that tigers are among the species exhibiting the most evidence of stress and/or psychological dysfunction in captivity. When tigers are deprived of conditions reflecting the basic needs of their species (which are lacking at the Downtown Aquarium and described in further detail below), they may suffer physical injury and are likelier to exhibit signs of stress and unnatural behavior, including what is called "stereotypic behavior."

32.     Stereotypic behavior includes a pattern of movement, like pacing, which is performed repeatedly, is relatively invariant in form, and has no apparent function or goal. Because these behaviors rarely are seen in wild animals, they are regarded as an indication of stress. Stereotypies may develop from other behavioral and physiological stresses, such as boredom, physical restraint, fear, or frustration.

33.     To reduce the potential for these problems, the Tiger Care Manual provides several instructions, which the Downtown Aquarium fails to meet.

**Species-Inappropriate Conditions at the Downtown Aquarium**

34.     For the reasons explained below, the conditions in which the Aquarium Tigers live are entirely inconsistent with their species' needs; have caused or are likely to cause actual injury; and are significantly likely to disrupt the tigers' natural behavioral patterns.

<u>No Outdoor Habitat or Access</u>

35.     The AZA's Tiger Care Manual reflects generally accepted practices in its instruction that, at a minimum, tigers "should be maintained in outdoor enclosures with access to natural light." X-1, Tiger Care Manual at 9 (¶ 1.2).

36.     The Tiger Care Manual further recommends that all tiger exhibits include several features, including a "[r]elatively large, complex outdoor space," along with other features associated with an outdoor space, including "[w]ater pools, moats, and/or running streams," "[n]atural vegetation," and "[t]rees or other natural substrate objects to allow nail grooming." *Id.* at 11 (¶ 2.1).

37.     That tigers should have outdoor access is a basic presumption of other aspects of the Tiger Care Manual and the USDA's regulations under the Animal Welfare Act. *See id.* (requiring sufficient shade from sunlight); 9 C.F.R. § 3.127 (requirements relating to outdoor facilities).

38.     It is undisputed that the tigers have not had access to the outside since arriving at the Downtown Aquarium in 2004. The Aquarium's curator, when asked

whether one of the tigers has "ever been outside" responded, "No. She has not. She has seen outside. But the fact of the matter is that they don't need to go outside."[2]

39.     The AZA has observed that—unlike the tiger exhibit at the Downtown Aquarium—"[n]ewer exhibits in AZA-accredited zoos have progressed toward the use of open-air enclosures with live vegetation and natural soil substrates." X-1, Tiger Care Manual at 11 (Exhibit Design).

40.     Of the more than a hundred AZA-accredited facilities housing tigers in the United States that were surveyed, *only two* reported that they do not have outdoor exhibits for the tigers: the Downtown Aquarium in Houston and the Downtown Aquarium in Denver. Both are owned by defendant Landry's, Inc.

41.     Denying the tigers access to the outdoors is significantly likely to disrupt their natural behavioral patterns, particularly given that in the wild, tigers would spend all their time outdoors. Deprivation of outdoor access causes the tigers significant stress and to engage in stereotypic and other abnormal behaviors.

42.     Further, depriving the Aquarium Tigers of access to outdoors has caused the tigers actual behavioral injuries, as evidenced by the tigers' stereotypic behaviors and other signs of pervasive stress and boredom. For example, the tigers have been observed pacing (a quintessential stereotypic behavior), in addition to panting and acting aggressively, including by lunging at the glass separating the tigers from the public.

43.     These conditions will continue to cause these injuries unless changed.

---

[2] Video at 1:03, White tiger controversy: Houston Downtown Aquarium, animal group clash over exhibit, KPRC Channel 2, available at http://www.click2houston.com/news/investigates/downtown-aquarium-animal-group-clash-over-white-tiger-exhibit (last viewed on Sep. 19, 2017).

<u>Inappropriate Holding Area</u>

44.     Holding cells are intended to be temporary. Indeed, the Tiger Care Manual regards holding cells not as regular living quarters but as "smaller shift facilities to permit safe cleaning, exhibit maintenance, or other separations…. Whenever possible, tigers should be given access to multiple enclosures to increase their living space and exceed the minimum requirements…. It is recommended that institutions with multiple adult tigers, regardless of their sex, have the ability to physically separate individuals long-term." X-1, Tiger Care Manual at 12 (Spatial recommendations).

45.     It is not generally accepted to have tigers spend the majority of their time in a holding cell for more than thirteen years.

46.     The Tiger Care Manual instructs:

> The same careful consideration regarding exhibit size and complexity and its relationship to the tiger's overall well-being must be given to the design and size of all enclosures, including those used in exhibits, holding areas, hospital, and quarantine/isolation (AZA Accreditation Standard 10.3.3).

X-1, Tiger Care Manual at 11 (¶ 2.1).

47.     When tigers are kept in small holding cells for long periods of time, they are likely to suffer stress, which will manifest itself through repetitive, boredom, or other stress behaviors. Keeping tigers in holding cages in close proximity to other unrelated tigers may compound their stress.

48.     Nonetheless, in the Tiger Holding Area, the Aquarium Tigers are kept in a series of cages, each of which is approximately 100 square feet in size.

According to Downtown Aquarium representatives, the tigers spend a ***minimum*** of 10 hours per day in the cages in the Tiger Holding Area.[3]

49.     Simple math confirms that the Aquarium Tigers spend a significant amount of time in the Tiger Holding Area. Only one tiger typically is on display inside the public Tiger Exhibit. The three remaining tigers remain locked in their cages in the Tiger Holding Area. This means that on average, the tigers are locked in a metal cage for a minimum of 75% of the day, or 18 hours—perhaps more, if tigers only are permitted in the Exhibit during opening hours. Even if, as the defendants assert, two tigers are sometimes on display, the tigers would spend an average of no less than 50% of their day locked in a metal cage.

50.     Even the Downtown Aquarium's low-end estimate falls short of generally accepted practices, as well as the letter and spirit of the AZA's instructions.

51.     Further, during the extensive time that the tigers are kept in the Tiger Holding Area, the unrelated tigers are kept in adjacent cages at the same time, even though at least two of the tigers are unable to be in the larger Tiger Exhibit at the same time without fighting or feeling stress.

52.     Keeping the tigers in small holding cages for extended periods of time and adjacent to unrelated tigers is inconsistent with tigers' needs as described in this complaint. Not only do the Aquarium Tigers not have any access to the

---

[3] Video at 1:36, White tiger controversy: Houston Downtown Aquarium, animal group clash over exhibit, KPRC Channel 2, available at http://www.click2houston.com/news/investigates/downtown-aquarium-animal-group-clash-over-white-tiger-exhibit (last viewed on Sep. 19, 2017).

outdoors or naturalistic elements while in these cages, they do not have room to naturally run or jump and lack opportunities to hide from the public's view.

53.   Keeping the tigers in small holding areas for extensive periods of time is significantly likely to disrupt their natural behavioral patterns, by causing them significant stress and causing them to engage in stereotypic behaviors, such as pacing, panting, and aggressive behavior described above.

54.   Similarly, placing the tigers in small holding areas for significant stretches of time has caused them actual injuries in the form of stereotypic behaviors and other signs of pervasive stress and boredom, such as pacing, in addition to panting and acting aggressively, including by lunging at the glass separating the tigers from the public.

55.   These conditions will continue to cause these injuries unless changed.

<u>Improper Substrate</u>

56.   It is well-accepted that hard, unnatural substrates may injure captive tigers and cause them stress.

57.   With regard to the substrate of tiger enclosures, the AZA cautions against the use of concrete or otherwise hard substrates because of the physical and behavioral injuries they may cause. Instead, the AZA instructs that "natural outdoor dirt substrates are recommended for tiger exhibits":

> For indoor enclosure areas that have non-dirt substrates, the choices of flooring are extensive. The most common material is concrete, which by itself is not recommended due to its porosity, abrasiveness, and hardness….
>
> Any surface used should provide good traction for tigers, especially when wet, but should not be abrasive so as to cause footpad trauma

during normal movement or exaggerated pacing. If the surface is too hard (e.g., concrete), trauma to bony prominences in normal resting or sleeping positions can result….

X-1, Tiger Care Manual at 12 (Substrates).

58.     This "trauma" can include injuries to the tigers' footpads, feet, hips, and other joints. Using unnatural substrates such as concrete also can result in stereotypic behaviors in captive animals such as pacing and cause stress resulting in other behavioral abnormalities.

59.     In spite of these recommendations and concerns, the Aquarium Tigers, whether in the Tiger Exhibit or Tiger Holding Area, live on unyielding and unnatural substrate. The substrate in the Tiger Exhibit is composed entirely of concrete or similar hard material. The floor in the Tiger Holding Area is similarly hard and artificial.

60.     Further, these hard, smooth surfaces easily can become wet and slippery, increasing the potential for injury, especially for any of the tigers (like, reportedly, Nero) who have been declawed. Indeed, visitors to the Downtown Aquarium have observed the tigers slipping and sliding in the Tiger Exhibit.

61.     Even if the Downtown Aquarium occasionally provides small piles of leaves and other softer material for the Aquarium Tigers to rest on, the amount provided is insufficient to overcome the unyielding surfaces the tigers must walk on in the Tiger Exhibit and Tiger Holding Area and is inconsistent with the letter and spirit of the Tiger Care Manual.

62.     Denying the Aquarium Tigers species-appropriate substrates is significantly likely to disrupt their natural behavioral patterns, by causing them

significant stress and causing behavioral abnormalities including stereotypic behaviors. By way of example, the tigers have been observed pacing, panting, and acting aggressively, including by lunging at the public viewing glass.

63. Depriving the tigers of species-appropriate substrates also has caused the tigers pervasive stress in the form of stereotypic behaviors and other behavioral abnormalities just described.

64. Further, by depriving the Aquarium Tigers of species-appropriate substrates, the Downtown Aquarium also has caused or is likely to cause actual physical injuries to the tigers, including inflammation to their joints and permanent damage to foot pads and injury to hip, leg, and foot muscles.

65. These conditions will continue to cause these injuries unless changed.

## V.   The Endangered Species Act

66. The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Because fish, wildlife, and plants "have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation," 16 U.S.C. § 1531, Congress enacted the ESA to "afford[] endangered species 'the highest of priorities.'" *Defenders of Wildlife v. Adm'r, EPA*, 882 F.2d 1294, 1300 (8th Cir. 1989). Persons violating the ESA risk civil and criminal penalties. *See* 16 U.S.C. § 1540(a)-(b). Private parties may bring lawsuits to enforce the ESA, so long as they provide adequate notice of sixty days to both the violator and the Secretary of the Interior. *Id.* § 1540(g).

67. An "endangered species" is "any species which is in danger of extinction." *Id.* § 1532(6). Since 1970, the FWS has listed tigers (*Panthera tigris*) as endangered at the species level. 50 C.F.R. § 17.11; 35 Fed. Reg. 8491 (June 2, 1970).

68. This listing applies equally to captive and wild members of the species. 50 C.F.R. § 17.11 (protecting tiger "wherever found"); *see also* 80 Fed. Reg. 7380, 7385 (Feb. 10, 2015) ("[T]he ESA does not allow for captive held animals to be assigned separate legal status from their wild counterparts on the basis of their captive status." "[C]aptive members of a listed species are also subject to the relevant provisions of section 9 of the ESA as warranted"); 81 Fed. Reg. 19923 (Apr. 6, 2016) ("Inter-subspecific crossed or generic tigers are listed as endangered under the Act.").

69. Because the breeding and sale of tigers in captivity may have a detrimental effect on the conservation of tigers in the wild, the FWS has repeatedly made clear that the ESA listing reaches generic tigers like the Aquarium Tigers. *See, e.g.*, 81 Fed. Reg. 19923, 19924 ("Current regulations under the ESA prohibit the taking of any tiger, including generic tigers.").

70. ESA Section 9 prohibits the "take" of an endangered species, including endangered tigers living in captivity, by any person. 16 U.S.C. § 1538(a)(1)(B). Congress defined the term "take" to mean "harass, harm, pursue, hunt, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). Congress intended to define "take" in the "broadest possible manner to include every conceivable way" in which any person could harm or kill fish or

wildlife. S. Rep. No. 307, 93rd Cong., 1st Sess. 1, reprinted in 1973 U.S. Code Cong. & Admin. News 2989, 2995.

71.     The FWS has construed the term "harass" to mean "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3. The U.S. Supreme Court has upheld these broad definitions. *See Babbitt v. Sweet Home Ch. of Cmties. for a Great Ore.*, 515 U.S. 687, 705 (1995) ("An obviously broad word that the Senate went out of its way to add to an important statutory definition is precisely the sort of provision that deserves a respectful reading."). When applied to captive wildlife, the term "harass" excludes "generally accepted… [a]nimal husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act… when such practices… are not likely to result in injury to the wildlife." 50 C.F.R. § 17.3. To fall within the scope of this exclusion, an animal husbandry practice must (1) be "generally accepted" ***and*** (2) comply with the AWA. *Hill v. Coggins*, – F. 3d –, No. 16-1457, 2017 WL 3471259, at *7 (4th Cir. Aug. 14, 2017).

72.     The FWS has defined the term "harm" as "an act which actually kills or injures wildlife." 50 C.F.R. § 17.3. No exemption for "generally accepted animal husbandry practices" exists in the definition of "harm" when applied to captive wildlife. This means a licensed exhibitor might implement generally accepted animal husbandry practices that meet or exceed the minimum standards of the

Animal Welfare Act but which nevertheless "harm" the endangered animal in their care and custody. 50 C.F.R. § 17.3.

73.     Nevertheless, the USDA's Animal Welfare Act regulations are not relevant here. The USDA's regulations at 9 C.F.R. §§ 3.129-3.135 set forth the catchall "animal health and husbandry standards" for "warmblooded animals other than dogs, cats, rabbits, hamsters, guinea pigs, nonhuman primates, and marine mammals"—a category which includes captive tigers. The USDA's catchall husbandry regulations only "ensure minimum standards of care and treatment," X-1, Tiger Care Manual at 7 (Federal laws and amendments), such as feeding, watering, sanitation, the appropriate number of employees, and rules regarding the separation of animals. *See* 9 C.F.R. §§ 3.129-3.135.

74.     The "animal health and husbandry" standards do not encompass any provisions regarding access to the outdoors, proper use of holding cages, access to natural light, or appropriate substrates for big cats—the specific conditions at issue here. Inspections by the United States Department of Agriculture would not involve review of the conditions raised by this complaint. Thus, any compliance or non-compliance with the Animal Welfare Act's "animal health and husbandry" or other provisions has no bearing on this lawsuit.

75.     The ESA expressly authorizes citizens to sue and seek an injunction against any "person" alleged to be responsible for a take, or otherwise in violation of the ESA, including any governmental instrumentality or agency. 16 U.S.C. § 1540(g)(1). The U.S. Supreme Court has held that because Congress

accorded the protection of endangered species the highest of priorities, federal courts lack discretion to withhold injunctive relief where it is necessary to prevent an imminent and likely violation of the ESA. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). A federal court must issue an injunction if a plaintiff establishes by a preponderance of the evidence that there is "a reasonably certain threat of imminent harm to a protected species." *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000).

## VI.   This Case Warrants Declaratory and Injunctive Relief

76.   Ms. Conley is entitled to declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 because this civil case presents an actual controversy for which this Court can declare rights and legal relations of the interested parties.

77.   An actual controversy exists between Ms. Conley and the Downtown Aquarium regarding whether the conditions in which it keeps the Aquarium Tigers violates Section 9 of the Endangered Species Act.

78.   Section 9 prohibits the "taking" of any endangered species. 16 U.S.C. § 1538(a)(1)(B). The ESA defines "take" in "the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." S. Rep. no. 307, 93d Cong., 1st Sess. (1973), reprinted in 1973 U.S.C.A.A.N. 2989, 2995. As described in more detail in this complaint, taking encompasses "harm" and "harassment." 16 U.S.C. § 1532(19).

79.   All defendants are persons subject to the ESA "take" provision, 16 U.S.C. § 1538(a), and citizen suit provision. 16 U.S.C. § 1540(g).

80.    To stop the ongoing violation of federal law, Conley seeks a judicial declaration of the Downtown Aquarium's obligations under the ESA pursuant to 28 U.S.C. §§ 2201 & 2202. Specifically, Conley seeks the following declarations:

    a.    The Downtown Aquarium has harassed and/or harmed the Aquarium Tigers by depriving them of outdoor access for more than 13 years.

    b.    The Downtown Aquarium has harassed and/or harmed the Aquarium Tigers by maintaining them in holding cages for significant amounts of time per day for more than 13 years.

    c.    The Downtown Aquarium has harassed and/or harmed the Aquarium Tigers by subjecting them to improper substrates for more than 13 years.

81.    Ms. Conley also is entitled to an injunction enjoining the Downtown Aquarium from continuing to hold the Aquarium Tigers in conditions that are species-inappropriate, including (a) keeping the tigers entirely indoors, (b) keeping the tigers in small holding cages for extended periods of time, and (c) forcing the tigers to spend all their time on hard, unnatural surfaces

82.    Ms. Conley further requests that the tigers be moved to a reputable sanctuary that will provide the tigers with a large, outdoor habitat where, for the first time in thirteen years, the Aquarium Tigers will be able to experience direct sunlight and walk on natural substrates. Conley will suffer irreparable injury if the Downtown Aquarium does not agree to transport the Aquarium Tigers to an accredited sanctuary. Ms. Conley suffers, and will continue to suffer, actual injuries

as the Downtown Aquarium continues to deprive the Aquarium Tigers of access to the outdoors, sunlight, and natural substrates. The Downtown Aquarium causes substantial aesthetic, emotional, and recreational harm to Ms. Conley, and physical, psychological, and emotional harm to the Aquarium Tigers. This harm is irreparable because it cannot be measured. Ms. Conley cannot be adequately compensated for the losses she and the Aquarium Tigers currently are suffering.

83.    The beneficial effect of injunctive relief will substantially outweigh any injury to the Downtown Aquarium. As is readily apparent in the media, there is public interest in improving the current living conditions of the Aquarium Tigers. As of the date of this complaint, a group named Free Houston Tigers has gathered more than 115,000 signatures on a petition to move the tigers to an accredited sanctuary.

84.    The injunctive relief Ms. Conley seeks will not adversely affect public policy or the public interest. Rather, enjoining the Downtown Aquarium from continuing to violate the ESA with respect to its possession and treatment of the Aquarium Tigers will cause a desirable result. It is unassailable that enjoining the Downtown Aquarium from its behavior will positively affect public policy and public interest in protecting endangered animals and promoting the "esthetic, ecological, educational, historical, recreational, and scientific value" that the ESA acknowledges such animals provide to the American people.

## VII.   Cause of Action

### The Downtown Aquarium Has Violated the ESA by
### Harming and Harassing the Aquarium Tigers

85.     Ms. Conley incorporates by reference the allegations in this complaint.

86.     As explained in more detail in this complaint, the Downtown Aquarium has violated the ESA by harassing or harming the Aquarium Tigers. The harms and harassment include:

a.   Depriving the Aquarium Tigers of any access to the outdoors.

b.   Keeping the Aquarium Tigers in the Tiger Holding Area for extended periods of time.

c.   Forcing the Aquarium Tigers to walk and lay entirely on hard substrate and not offering species-appropriate accommodations.

87.     Preventing all access to the outdoors has "harassed" the Aquarium Tigers by significantly disrupting their ability to engage in normal behavioral patterns for tigers. Keeping the tigers entirely indoors does not amount to a generally accepted animal husbandry practice, let alone one that meets or exceeds the minimum standards for facilities and care under the Animal Welfare Act, and falls short of the minimum standards set for by the AZA.

88.     Keeping the tigers entirely indoors also has "harmed" the Aquarium Tigers because it has actually injured them, including by affecting their normal behavioral patterns and by causing stress and behavioral abnormalities, including repetitive pacing or lunging.

89.     Keeping the Aquarium Tigers in close confinement in the Tiger Holding Area for extended periods of time has "harassed" the Aquarium Tigers by significantly disrupting their ability to engage in normal tiger behaviors. Keeping the tigers in close confinement does not amount to a generally accepted animal husbandry practice, let alone one that meets or exceeds the minimum standards for facilities and care under the Animal Welfare Act and falls short of the minimum standards set for by the AZA.

90.     Keeping the Aquarium Tigers in close confinement for extended periods of time also has "harmed" the Aquarium Tigers because it has caused them actual injury, including by affecting their normal behavioral patterns and by causing stress and other behavioral abnormalities, such as repetitive pacing or lunging.

91.     By forcing the Aquarium Tigers to spend all their time on hard, unnatural substrate, the Downtown Aquarium also has "harassed" them within the meaning of the ESA definition of "take" by significantly disrupting their ability to engage in normal tiger behaviors. Keeping the tigers on mostly hard substrates does not amount to a generally accepted animal husbandry practice, let alone one that meets or exceeds the minimum standards for facilities and care under the Animal Welfare Act and falls short of the minimum standards set for by the AZA.

92.     By forcing the Aquarium Tigers to spend all their time on hard, unnatural substrate, the Downtown Aquarium has "harmed" them within the meaning of the ESA definition of "take." The Downtown Aquarium has actually

injured the Tigers, including by affecting their normal behavioral patterns and by causing stress and other behavioral abnormalities, such as repetitive pacing. The Aquarium also has actually injured the Tigers by causing inflammation in their joints and other actual physical injuries to their footpads, feet, legs, and hips.

93.    For any one of the reasons above, the Downtown Aquarium has "taken" the Aquarium Tigers within the meaning of the ESA.

94.    As described in this complaint, these violations warrant the declaratory and injunctive relief Ms. Conley seeks.

<u>Prayer for Relief</u>

Plaintiff Cheryl Conley respectfully requests that this Court enter judgment in her favor and order the following relief:

A.    Declare that the Downtown Aquarium violated Section 9 of the ESA, 16 U.S.C. § 1538, by depriving them of outdoor access for more than 13 years;

B.    Declare that the Downtown Aquarium violated Section 9 of the ESA, 16 U.S.C. § 1538, by keeping them in holding cages for improper amounts of time over the last 13 years;

C.    Declare that the Downtown Aquarium violated Section 9 of the ESA, 16 U.S.C. § 1538, by subjecting them to improper substrates for more than 13 years;

D.    Enjoin the Downtown Aquarium from housing the Aquarium Tigers in the improper conditions identified in paragraphs A-C above;

E.    Enjoin the Downtown Aquarium from housing other tigers in the future in the improper conditions identified in paragraphs A-C above;

F.      Order the Downtown Aquarium to remedy its violations within 60 days

or other reasonable time, or relocate the Tigers to an accredited sanctuary;

G.      Award Ms. Conley her costs and reasonable attorneys' fees, including

expert witness fees, as authorized by the ESA, 16 U.S.C. § 1540(g)(4); and

H.      Award such other relief as this Court deems just and appropriate.


Date: September 26, 2017

Respectfully submitted,

IRVINE & CONNER PLLC

by: *s/ Kristen Schlemmer*
      Kristen Schlemmer, Attorney-in-Charge
      TBN 24075029 / SDTX No. 2078411
      Charles Irvine
      TBN 24055716 / SDTX No. 675029
      Mary Conner
      TBN 24050440 / SDTX No. 1093200
      Michael McEvilly
      TBN 24088017 / SDTX No. 2218880
      4709 Austin
      Houston, Texas 77004
      713.533.1704
      713.524.5165 (fax)
      kristen@irvineconner.com

      **OF COUNSEL:**
      Animal Legal Defense Fund
      Anthony Eliseuson
      (Pro hac vice admission pending)
      1755 West Roscoe Street, Unit 3
      Chicago, Illinois 60657
      707.795.2533
      707.795.7280 (fax)
      aeliseuson@aldf.org

      *Counsel for Plaintiff Cheryl Conley*